ERA–NORTHERN ASSOCIATES

v.

**BORDER TRUST CO.**

Supreme Judicial Court of Maine.

Argued March 30, 1995.

Decided Aug. 9, 1995.

Jed Davis (orally), Jim Mitchell and Jed Davis, P.A., Augusta, for plaintiff.

Jacqueline W. Rider (orally), Michael T. Healy, Verrill & Dana, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, and LIPEZ, JJ.

ROBERTS, Justice.

Border Trust Company (the Bank) appeals from a judgment entered in the Superior Court (Kennebec County, *Alexander, J.*) finding that the Bank had been unjustly enriched in the amount of $14,500 by the real estate brokerage efforts of ERA–Northern Associates. We conclude that there is no competent evidence to support a finding that the Bank retained a benefit of $14,500, and accordingly we vacate the judgment.

In the spring of 1990 Michael Ouellette purchased a parcel of real estate in Monson on which a store, garage, and a single-family residence were located. The Bank financed Ouellette's purchase through a mortgage for $137,000, and Ouellette borrowed an additional $20,000 by giving the Bank a single-payment note secured by equipment, inventory, and machinery. Later that year Ouellette defaulted on his mortgage debt and eventually filed a bankruptcy petition. In February 1991 he was discharged in bankruptcy from both of his debts to the Bank. The Bank and Ouellette discussed the possibility of Ouellette conveying the property to the Bank in lieu of foreclosure, but did not reach an agreement at that time.

The lessees of the property, Douglas and Sally O'Donnell, then attempted to obtain financing to purchase the entire parcel of real estate and submitted an application to the Bank for a $150,000 mortgage loan. The Bank rejected the application because the O'Donnells had not signed a purchase and sale agreement with Ouellette.

On April 4, 1991, Ouellette and ERA, through its agent Paul Wade, entered into an exclusive right-to-sell agreement providing for a ten percent commission in the event of a sale. The contract listed a price of $160,-000 and explicitly excluded from its terms a sale to the O'Donnells within 30 days. On April 5, Ouellette called Charles LeBrun, the senior vice-president of the Bank, and told him that he had listed the property for sale through ERA. LeBrun told Ouellette that he hoped it was for a price in excess of $180,000 so there would be enough proceeds to cover his obligations to the Bank and the agent's commission. When Ouellette informed him that it was not listed for that amount, LeBrun replied, "Well, we're going to have to do what we need to do in order to protect the Bank's interest." LeBrun then directed the Bank's attorney to initiate foreclosure proceedings.

From April to July, Wade tried to sell the property without success. After the expiration of the 30–day exclusion period, Wade pursued the O'Donnells as potential buyers of the property. His efforts led to a series of offers. First, on August 8, the O'Donnells offered to purchase the entire parcel for $135,000. On August 13, Ouellette rejected that offer and made a counteroffer of $165,-000. On August 19, the O'Donnells responded with a further offer of $145,000, which Ouellette again rejected.

On August 28, LeBrun called Wade. Referring to his notes of the conversation, Wade testified to the content of the conversation, which forms the basis for his complaint:

> Charlie [LeBrun] called me and he asked—he said that he understood that we were negotiating—or trying to negotiate a sale between Mike Ouellette and the

O'Donnells, and he made a statement to me to the effect, "What would actually get this—this property sold?" And I mentioned to him that—that, as far as I could see, Mike Ouellette would—would take five thousand dollars cash and sign off the property to the bank, and—and then they could sell it to the O'Donnells. And he said that he would talk to Mike Ouellette—says here, "Will talk to Mike Ouellette about getting the property and—and sign it off." And at that time I told him that—that ERA does have an exclusive listing and would be glad to work with the bank to sell this property and bring the sale about.

On cross-examination Wade further explained the conversation:

> [LeBrun] said, "What's it gonna take to get this deal accomplished?" And I told him. I said that [Ouellette] wanted a hundred and fifty thousand dollars, and he wanted five thousand dollars—he wanted five thousand dollars and he'd sign the papers, and then the bank could have—sell it to the O'Donnells for whatever they wanted to.

On September 2, Ouellette conveyed the property to the Bank in lieu of foreclosure, and received in return (1) $3,000, (2) permission to live in the residence until December 31, 1991, and (3) a release from the obligation to pay the $20,000 note.[1] On learning of the Bank's acquisition, the O'Donnells offered to purchase the property for $145,000 if the Bank would finance that amount.

On September 3, Wade spoke with Ouellette, who told him that the Bank now owned the property. On September 4, Wade spoke with Douglas O'Donnell, who told him that he had met with the Bank and that the bank officials would be meeting on September 12 to decide whether to give the O'Donnells a loan. Wade than called LeBrun, who told him that Ouellette had conveyed the property to the Bank and that the Bank was negotiating with the O'Donnells about purchasing the property.

---

1. Ouellette had been discharged from this debt in the bankruptcy proceeding. The Bank, however, was pursuing a legal action against Ouellette because he had allegedly sold some of the property that secured the note.

The Bank approved the loan to the O'Donnells on September 10. On September 16, Wade asked Ouellette what was going on, and Ouellette responded that the Bank gave him what he wanted so he sold it the property. Wade then called LeBrun. LeBrun told him that the Bank was going to sell the property to the O'Donnells. Wade told LeBrun that ERA was due a commission as a result of the sale. LeBrun said he was comfortable with the Bank's position, but said he would speak to his boss and get back to Wade. Wade had no further communication with the Bank on this issue. On September 20, the Bank conveyed the property to the O'Donnells in exchange for a mortgage in the amount of $145,000. After deducting the closing costs, the Bank received $142,044.53.

ERA filed a complaint against the Bank in the Superior Court alleging breach of contract, *quantum meruit*, and unjust enrichment. A jury-waived trial was held in April 1994. The court granted the Bank's motion for a judgment as a matter of law on the breach of contract claim, and entered a judgment for ERA in the amount of $14,500 on the basis of unjust enrichment. After the court denied the Bank's motion for additional findings, the Bank filed this appeal.

## I.

### Unjust Enrichment

■ To establish a claim for unjust enrichment ERA must prove that (1) it conferred a benefit on the bank, (2) the Bank had appreciation or knowledge of the benefit, and (3) the Bank's acceptance or retention of the benefit was under such circumstances as to make it inequitable for the Bank to retain the benefit without payment of its value. *Bowden v. Grindle*, 651 A.2d 347, 350 (Me. 1994). The trial court's conclusions on the elements of unjust enrichment are factual findings and we will not set them aside as clearly erroneous unless there is no competent evidence in the record to support them. *Aladdin Elec. Assocs. v. Town of Old Orchard Beach*, 645 A.2d 1142, 1144 (Me.1994).

Contrary to the Bank's assertions, there was competent evidence to support findings that ERA conferred a benefit on the Bank

and that the Bank had an appreciation or knowledge of the benefit. It was not erroneous for the court to conclude that ERA's negotiations with both Ouellette and the O'Donnells and the information that ERA provided to the Bank concerning Ouellette's bottom-line desires were of importance to the finalization of the deal between the Bank and Ouellette and the subsequent sale to the O'Donnells. Nor was it error to conclude that the Bank knew that it had received this beneficial information from ERA or that it knew that ERA had negotiated with the parties. *See George C. Hall & Sons, Inc. v. Taylor*, 628 A.2d 1037, 1038–39 (Me.1993).

There was also competent evidence to support the court's finding that it would be inequitable for the Bank to retain the benefit without payment of its value. The Bank purchased the property from Ouellette and sold it to the O'Donnells pursuant to the terms suggested by ERA. The unusual fact in this case is that Ouellette had been discharged from his mortgage debt to the Bank. Consequently, the Bank was in a unique position to purchase the property directly from Ouellette for a sum that was offset by the amount of the Bank's lien on the property. A sale to the Bank would thus generate only a minimal real estate commission under the terms of the exclusive listing agreement. By acting as a middleman between Ouellette and the O'Donnells, the Bank accomplished an immediate sale of the property without subjecting the $145,000 sale price to a commission. The court found that ERA's advice was "a significant benefit" and that its promotion of the property was "essential" to the sale. On that basis, the court concluded that "it would be completely inequitable for the Bank to retain the considerable benefits resulting from the sale without payment to [ERA]." Although the evidence might support contrary findings, the court's findings were not clearly erroneous.

## II.

### Value of Benefit Conferred

■ The court found that it was "not possible to calculate the benefit conveyed to the Bank by ERA–Northern Associates' advice

with exact precision." It described the benefit to the Bank as the avoidance of the costs and delays of a foreclosure proceeding coupled with a sale price higher than that which a foreclosure auction would produce. The court concluded that the value of the benefit conferred on the Bank was "of a value within the range of the 10% requested commission." The court awarded ERA $14,500 as "the equivalent of a 10% [commission] on the sale price." The Bank contends that the value of the benefit it retained was only $2,244.53.

"Recovery under the doctrine of unjust enrichment is measured by the value of the benefits that the plaintiff proves are actually received and retained by the defendant." *A.F.A.B., Inc. v. Town of Old Orchard Beach,* 639 A.2d 103, 106 (Me.1994). "The damages analysis is based on principles of equity, not contract." *Aladdin Elec. Assocs.,* 645 A.2d at 1145. We conclude that there is no competent evidence in the record from which the court could properly value the benefit conferred at $14,500.

ERA provided no evidence of the value of the benefit conferred. The record contains no evidence of the savings that the Bank experienced by avoiding a foreclosure. Similarly, there is no evidence about the sale price that the Bank could expect to receive at a foreclosure auction. The court's arbitrary valuation of these benefits as equal to the ten percent commission rate in ERA's contract with Ouellette was clearly erroneous. Because the Bank concedes that it realized a benefit in the amount of $2,244.53, we remand for the entry of a judgment in that amount.

The entry is:

Judgment vacated.

Remanded for the entry of a judgment for ERA–Northern Associates in the amount of $2,244.53.

All concurring.